UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KRISTEN JOY KEIDERLING,           )
                                  )
        Plaintiff,                )
                                  )
        v.                        )   Case No. 3:19-cv-30097-KAR
                                  )
ANDREW M. SAUL,                   )
Commissioner of Social            )
Security Administration,          )
                                  )
        Defendant.                )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 14 & 22)

ROBERTSON, U.S.M.J.

I.      INTRODUCTION

Kristen Joy Keiderling ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.* Plaintiff applied for DIB on June 12, 2014 alleging a May 18, 2012 onset of disability due to depression, anxiety, and attention deficit disorder ("ADD") (Administrative Record "A.R." at 19, 355, 428). After a hearing on April 18, 2018, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled from May 18, 2012 through December 31, 2017, the date last insured, and denied her application for DIB on September 5, 2018 (A.R. at 19-43, 348). The Appeals Council considered additional information submitted by Plaintiff and denied review on May 23, 2019

1

(A.R. at 1-8).  Thus, Plaintiff is entitled to judicial review.  *See Smith v. Berryhill,* 139 S. Ct. 1765, 1772 (2019).

Plaintiff seeks remand or reversal based on her claim that the ALJ erred by failing to afford controlling weight to her treating psychiatrist's April 13, 2016 opinion.  Pending before this court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 14), and the Commissioner's motion for an order affirming his decision (Dkt. No. 22).  The parties have consented to this court's jurisdiction (Dkt. No. 13).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons discussed below, the court will GRANT the Commissioner's motion for an order affirming the decision and DENY Plaintiff's motion.

II.   FACTUAL BACKGROUND

A.   Plaintiff's Educational Background and Work History

Plaintiff was thirty-seven years old on the alleged disability onset date (A.R. at 19, 41). She had obtained a bachelor's degree in psychology from Gordon College in 1998 and a certificate in medical assisting in 2010 (A.R. at 356).  She had worked as a full-time cashier at WalMart for nine years where she supervised other cashiers for less than one year (A.R. at 357, 376-77).  Her supervisory duties included counting the cash for the other cashiers' registers (A.R. at 377).  She lost that job in May 2012 because she took "numerous leaves of absence" due to her mental condition and exhausted her family medical leave allowance (A.R. at 22, 417, 656).

B.   Mental Health Records !

!   Plaintiff provided mental health treatment records that spanned the six and one-half years from October 2011 to April 2018.

Plaintiff's premature baby died in May 2010 (A.R. at 941, 1127).  The child would have been born in or around October of that year if carried to term (A.R. at 941, 1127).

2

From October 6 to October 11, 2011, Plaintiff received inpatient treatment for depression and anxiety at the Noble Hospital (A.R. at 900, 943).  At the time of her admission, she was "isolating, [had] no energy and motivation, [was] over-sleeping and [had a] disrupted appetite" (A.R. at 900).  Although she was employed at WalMart, she had not been working because of her symptoms (A.R. at 900, 941, 944).

She was discharged to the hospital's Partial Hospitalization Program ("PHP") where she was diagnosed with depressive disorder NOS and anxiety NOS (A.R. at 900, 941).  Plaintiff "fully participated in all aspects of her treatment" (A.R. at 900).  She "routinely presented with a bright affect and demonstrated a good amount of energy" (A.R. at 900).  Plaintiff "was helpful and supportive to her peers [in the program], giving encouragement and thoughtful commentary" (A.R. at 900).  Upon discharge, her assessed Global Assessment Functioning ("GAF") score was 55 (A.R. at 900).[1]  Plaintiff's discharge plan was to continue treating with her therapist at the Carson Center and to engage a psychiatrist for medication (A.R. at 900).

On October 24, 2011, Brian Pickell, Psy.D., of Riverbend Behavioral Health conducted an initial evaluation of Plaintiff, who sought medication management (A.R. at 942-45).  Plaintiff indicated that she was married, was employed at a retail store (WalMart), had a few close friends, and had "numerous interests" (A.R. at 941, 944).  Plaintiff presented as "alert, oriented x3, without cognitive disturbance.  [There was] [n]o overt evidence of thought disturbance.  Sleeping [was] problematic.  Eating varie[d]" (A.R. at 944).  Plaintiff reported a depressed mood and "problems with anxiety" (A.R. at 944).  Mr. Pickell observed that Plaintiff presented with a

---

[1] "The GAF scale gauges an individual's psychological, social, and occupational functioning on a scale of 0 to 100." *Martinez v. Colvin*, Civil Action No. 13-30124-KPN, 2014 WL 3735889, at *3 n.1 (D. Mass. July 11, 2014) (citation omitted).  "Scores of 51 to 60 indicate moderate symptoms or difficulty in functioning." *Id.*

"bright mood" (A.R. at 944).  She was diagnosed with depressive disorder, not elsewhere classified (A.R. at 944).  A GAF score of 55 was recorded (A.R. at 944).

Plaintiff was first evaluated for medication management by Ali A. Moshiri, M.D. of Riverbend Behavioral Health on November 2, 2011 (A.R. at 940).  Plaintiff had been taking Zoloft and Ativan for about a year (A.R. at 941).  Plaintiff was able to provide adequate information, was alert, oriented, and well-kempt, and displayed no gross cognitive deficits (A.R. at 941).  Her judgment was intact (A.R. at 941).  Her affect was appropriate and "somewhat arduous" (A.R. at 941).  Dr. Moshiri diagnosed depression and assessed a GAF score of 45 (A.R. at 941).[2]  Plaintiff appeared "stable and in good spirits" without acute signs during her November 30, 2011 follow-up visit to Dr. Moshiri (A.R. at 939).

On February 22, 2012, Plaintiff reported to Dr. Moshiri that she had been more depressed "for no known reason" (A.R. at 938).  She appeared stable and "in fair spirits with moderate dysphoria" and "no other acute signs" (A.R. at 938).  Dr. Moshiri prescribed Wellbutrin (A.R. at 938).  On April 11, 2012, Plaintiff reported that Wellbutrin helped to relieve her depression (A.R. at 937).  Dr. Moshiri again noted that Plaintiff appeared stable and "in fair spirits with moderate dysphoria" (A.R. at 936, 937).

Plaintiff attended Noble Hospital's PHP on May 24, 2012 (A.R. at 902).  She was diagnosed with depressive disorder NOS and anxiety disorder NOS.  She was assigned a GAF

---

[2] "A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Lopez-Lopez v. Colvin*, 138 F. Supp. 3d 96, 102 n.7 (D. Mass.), *on reconsideration in part,* 144 F. Supp. 3d 260 (D. Mass. 2015) (citation omitted).

score of 40 (A.R. at 902).[3]  She dropped out of the program after attending for one day because it was not "'fun'" (A.R. at 902).

On June 20, 2012 and September 12, 2012, Plaintiff reported to Dr. Moshiri that Wellbutrin relieved her depression (A.R. at 935, 936).  She was using little to no Ativan in September (A.R. at 935).  During both visits, Dr. Moshiri noted that Plaintiff appeared "stable and in fair spirits with moderate dysphoria" (A.R. at 935, 936).

Dr. Moshiri's observation during Plaintiff's December 5, 2012 visit was consistent with his observation of her during her September 12, 2012 visit (A.R. at 934).  On December 5, 2012, Plaintiff reported that she had discontinued her medication because she was pregnant, but had suffered a miscarriage (A.R. at 934).  She was "doing well" and wished to remain off her medication (A.R. at 934).

On April 3, 2013, Plaintiff reported to Dr. Moshiri that she became depressed and anxious and had difficulty sleeping when she was not taking medication (A.R. at 933).  Dr. Moshiri prescribed Zoloft, Ativan, as needed, and Vistaril (A.R. at 933).  Dr. Moshiri observed that Plaintiff's speech was normal, her eye contact was good, she was alert, oriented, and well-kempt (A.R. at 933).  He did not note any gross cognitive deficits (A.R. at 933).  He further indicated that her judgment was intact, and her affect was appropriate and "moderately anxious" (A.R. at 933).

After Plaintiff's therapist at the Carson Center referred Plaintiff to Noble Hospital's PHP due to an increase in her depression and anxiety symptoms, Plaintiff fully participated in all

---

[3] "A GAF score in the 31–40 range 'indicates [s]ome impairment in reality testing or communication . . . [or] major impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Lopez-Lopez*, 138 F. Supp. 3d at 99 n.6 (alterations in original) (citation omitted).

aspects of her treatment from May 2 to 22, 2013 (A.R. at 903).  She was "isolating a great deal" and was staying in bed before she attended the program (A.R. at 903).  Her condition was exacerbated by overuse of her prescription anxiety medication (A.R. at 903).  After the PHP staff discussed the risks and potential consequences of misuse with Plaintiff, she took the medication as prescribed (A.R. at 903).  Plaintiff overcame her initial tendency to isolate and recognized the benefits of spending a productive day with peers (A.R. at 903).  Because the program helped Plaintiff to structure her time, she was concerned about being alone after the program concluded when she would have "too much time to think and feel in ways that [were] not productive or expressed, resulting in feeling stuck with the same repetitive racing thoughts and feelings" (A.R. at 904).  On her discharge date, she was diagnosed with depressive disorder NOS and anxiety NOS and her assessed GAF score was 58 (A.R. at 903).

During Plaintiff's May 29, 2013 visit to Dr. Moshiri, she reported that she was prescribed Wellbutrin during her attendance at the Noble Hospital's PHP (A.R. at 931).  She stopped taking it after a few days, however, because it caused her to shake (A.R. at 931).  She began taking Klonopin, but did not feel that it was as effective as Ativan (A.R. at 931-32).  Vistaril helped her to sleep (A.R. at 932).  Dr. Moshiri prescribed Vistaril, Ativan, and Zoloft (A.R. at 932).  His observations of Plaintiff mirrored those of her visit during the previous month, including her "moderate" anxiety (A.R. at 932).

Plaintiff visited Dr. Moshiri on August 21, 2013 for a follow-up of depression and anxiety (A.R. at 930).  She reported that she was "doing well" and was using "very little Ativan" (A.R. at 930).  However, she was concerned about some "possible triggers" (A.R. at 930).  Specifically, her parents were selling the family home and moving and her husband was

changing jobs (A.R. at 930).  Dr. Moshiri observed that Plaintiff's affect was "appropriate and moderately anxious" (A.R. at 930).

During Plaintiff's November 13, 2013 visit to Dr. Moshiri, she reported that she had been hired as a cashier for the holiday season and hoped the job would provide an incentive to leave her house (A.R. at 929).  Zoloft continued to be "moderately helpful," but her depression had increased (A.R. at 929).  Dr. Moshiri added Wellbutrin to her medication at Plaintiff's request (A.R. at 929).  Plaintiff's mental status examination revealed that she was alert, oriented, well kempt, pleasant, and cooperative (A.R. at 929).  Her speech was normal, she made good eye contact, and gave adequate information (A.R. at 929).  Dr. Moshiri did not observe any gross cognitive deficits (A.R. at 929).  Plaintiff's judgment was intact and her affect was appropriate (A.R. at 929).

On December 11, 2013, Plaintiff told Dr. Moshiri that she found the cashier's job to be "very stressful" and quit after three weeks because of a "marked increase" in her anxiety and difficulty sleeping (A.R. at 927).  She increased her use of Ativan, continued to use Zoloft, and stopped taking Wellbutrin because she felt that it made her more anxious (A.R. at 927-28).  Dr. Moshiri noted Plaintiff's moderately anxious affect (A.R. at 928).

On December 19, 2013, Clinician Pam Bachrach of the Carson Center noted that Plaintiff was having difficulty attending scheduled appointments because she felt "'too depressed or too anxious to come'" (A.R. at 764).  She recently left a retail job that was "'too overwhelming'" (A.R. at 764).  She stayed in bed all day, isolated, and lacked the motivation to engage in any activities (A.R. at 764-65).  Plaintiff was diagnosed with generalized anxiety disorder, dependent personality disorder, and assessed a GAF score of 35 (A.R. at 765).  Ms. Bachrach recommended inpatient hospitalization or the Noble Hospital's PHP (A.R. at 765).

Therapist Cindy Miller's February 27, 2014 Carson Center progress note indicated diagnoses of a generalized anxiety disorder and dependent personality disorder (A.R. at 1007). Although Plaintiff expressed ambivalence about improving her depression, she wanted a better relationship with her husband with whom she was "always" arguing (A.R. at 1008).

The record of Plaintiff's March 19, 2014 visit to Dr. Moshiri indicated diagnoses of "anxiety state – unspecified," and depressive disorder, not elsewhere classified (A.R. at 926). Plaintiff reported feeling "extremely anxious" (A.R. at 926). She felt that her medications were no longer effective and agreed to try BuSpar (A.R. at 926). Dr. Moshiri noted "no overt anxiety" (A.R. at 926). During Plaintiff's follow-up visit to Dr. Moshiri on April 16, 2014, she noted that the BuSpar relieved her anxiety but made her sleepy, she no longer used Ativan, but continued taking Zoloft (A.R. at 924). Dr. Moshiri decreased the dosage of BuSpar (A.R. at 924). On Plaintiff's mental status examination, Dr. Moshiri noted a "marked decrease" in her anxiety (A.R. at 925).

Plaintiff was discharged from the Carson Center on April 14, 2014 due to irregular attendance (A.R. at 769). Plaintiff stated that she lacked motivation to make progress in therapy (A.R. at 769).

On July 7, 2014, Plaintiff underwent an initial assessment for therapy services at the Koinonia Services Trust (A.R. at 895). She was diagnosed with depressed mood NOS, an eating disorder NOS, recurrent PTSD (provisional), and dependent personality disorder (provisional) (A.R. at 896). A GAF score of 50 was assessed (A.R. at 896). The mental status examination indicated Plaintiff's inadequate impulse control, good to fair insight and judgment, depressed and anxious mood and affect, inadequate self-care, fair to poor sleep, clear and pressured speech, and logical and loose thoughts with concentration and memory impairment (A.R. at 895). The record

noted that Plaintiff found daily living skills overwhelming and she "escape[d] into poor coping skills" (A.R. at 895). "Although she [was] a graduate from college, she [was] not able to cope with structures of activities in a work environment" (A.R. at 895). Her goals were to improve her coping skills and manage her stress through therapy (A.R. at 895).

During Plaintiff's July 9, 2014 visit to Dr. Moshiri, she reported a decrease in anxiety because she was not faced with the stress of working, but "financial issues" left her feeling more depressed (A.R. at 923). Dr. Moshiri increased the dosage of Zoloft at Plaintiff's request (A.R. at 923). The treatment notes indicated that Plaintiff's judgment was intact and her affect was "appropriate" (A.R. at 923).

On the advice of her therapist, Plaintiff attended the Noble Hospital's PHP from September 16 to September 30, 2014 because her depression and anxiety symptoms interfered with her daily functioning (A.R. at 905). She described her decreased energy and motivation and her isolation at home (A.R. at 905). Without the daily structure that employment provided, she had "'too much time in her head'" (A.R. at 905). Plaintiff's participation in the PHP enabled her to attend a Red Sox baseball game with her husband and to have coffee with a peer from the program (A.R. at 905). She also improved her ability to cope with stressors due to grief and conflicts in her relationships (A.R. at 905). She identified doing volunteer work at the Boys and Girls Club library as a means of preventing a return to isolation (A.R. at 905). Plaintiff's diagnoses were persistent depressive disorder (dysthymia) with intermittent major depressive episodes, with current episode, and generalized anxiety disorder (A.R. at 905). Her assessed GAF score was 55 (A.R. at 905).

On September 17, 2014, Plaintiff told Dr. Moshiri that she had reduced her dosage of Wellbutrin because she found it to be "overstimulating," but had seen only a partial improvement

in her depression (A.R. at 921).  Because Plaintiff indicated that her prolonged use of Zoloft had reduced its efficacy, Dr. Moshiri replaced Zoloft with Celexa (A.R. at 921).  Her mental status examination remained unchanged since July (A.R. at 922).  Two months later in November 2014, Dr. Moshiri indicated that Plaintiff felt less depressed after she switched from Zoloft to Celexa during her attendance at the PHP (A.R. at 905, 920).

Plaintiff visited Dr. Moshiri on February 4, 2015 and reported that she was "very depressed," did not want to get out of bed, and Klonopin relieved her anxiety (A.R. at 918).  Dr. Moshiri directed her to discontinue Celexa and resume Zoloft (A.R. at 918).  Dr. Moshiri noted her "moderate dysphoria" (A.R. at 918).

During Plaintiff's April 29, 2015 visit to Dr. Moshiri, she reported that she was "doing better" and was using little or no Klonopin (A.R. at 917).  Dr. Moshiri's mental status examination revealed that her affect was "appropriate" (A.R. at 917).

Three months later, on July 22, 2015, Plaintiff reported that she was "doing very well," was using homeopathic medication, was not using Klonopin, and wanted to discontinue Wellbutrin and Zoloft (A.R. at 1030).  Dr. Moshiri agreed (A.R. at 1030).  He again noted that Plaintiff's affect was "appropriate" and that the other aspects of her mental status remained unchanged (A.R. at 1030).

The record of Plaintiff's December 9, 2015 visit to Dr. Moshiri indicated that Plaintiff was anxious and depressed (A.R. at 1028).  She was doing "okay" from the time she stopped using medication in July until she began working in a retail store around Thanksgiving (A.R. at 1028).  She quit the job because of anxiety (A.R. at 1028).  Klonopin helped to relieve her anxiety and Dr. Moshiri prescribed Zoloft for her depression (A.R. at 1028).  Plaintiff's mental

status examination noted "[s]evere anxiety," "restlessness," and [m]oderate dysphoria" (A.R. at 1028).

On January 20, 2016, Plaintiff reported to Dr. Moshiri that her husband's back injury caused him to lose his job, which resulted in financial problems and marital discord (A.R. at 1026). Klonopin brought "some" relief and she was treating with a therapist, Bertine Galipeau of the Koinonia Services Trust (A.R. at 1026). Dr. Moshiri noted that no medications were optimal "because of the situational nature of the current circumstance and [Plaintiff's] emotional reactions to it" (A.R. at 1026). The mental status examination indicated that Plaintiff was alert, oriented, well-kempt, pleasant, cooperative, and able to give adequate information (A.R. at 1026). Her speech was normal and she made good eye contact (A.R. at 1026). Dr. Moshiri did not detect gross cognitive deficits (A.R. at 1026). Plaintiff's judgment was intact and her affect was appropriate (A.R. at 1026).

On April 13, 2016, Plaintiff told Dr. Moshiri that she was "extremely depressed, anxious, having crying spells and . . . having a hard time functioning" because her husband left their home, returned, but was leaving again (A.R. at 1024). Dr. Moshiri endorsed her application for disability benefits because she was "unable to function in her work settings beyond some days" (A.R. at 1024). Plaintiff was advised to replace Zoloft with Effexor XR and to continue Klonopin, which was helpful (A.R. at 1024). The notes of the mental status examination mirrored the notes from the previous visit, but Dr. Moshiri noted that Plaintiff appeared "quite distraught but in control" (A.R. at 1024).

Plaintiff visited Dr. Moshiri on May 18, 2016 for a follow-up of her depression and anxiety (A.R. at 1218). She reported that she was doing "a lot" better on Effexor and was able to reduce her use of Klonopin to once or twice a week (A.R. at 1218). She reported that she was

"doing more" and was seeing her therapist every week or every two weeks (A.R. at 1218).  On

mental status exam, Dr. Moshiri noted that her affect was "appropriate" (A.R. at 1218).

On June 14, 2016 Debbie L. Murray, PA-C of Riverbend Medical noted that Plaintiff was

"very anxious" about travelling alone to Arizona to a "holistic rehab type center" for help with

anxiety, depression, and stress eating (A.R. at 1032-33).  Although she had Klonopin, she used it

"rarely" because she had some dependency issues in the past (A.R. at 1033).

From June 19, 2016 to August 6, 2016, Plaintiff received treatment for an atypical binge

eating disorder, anxiety, and depression at the Remuda Ranch at The Meadows' ("Remuda

Ranch") residential program in Arizona (A.R. at 1042-59, 1216).  At the beginning of the initial

psychological examination conducted by Judy K. Ferriell, N.P., Plaintiff had difficulty focusing

and was hyperventilating, but later calmed down (A.R. at 1047).  Her mood was "very anxious,"

her affect was "normally anxious," and her insight and judgment were poor (A.R. at 1047).

Plaintiff indicated that her anxiety was "out of control" and she stayed at home (A.R. at 1046).

Because "being around people" made Plaintiff feel claustrophobic and to experience panic

attacks, she was unable to work or shop in a retail store (A.R. at 1046).  She described

"freak[ing] out" when she walked into the WalMart where she had worked (A.R. at 1046-47).

Ms. Ferriell assessed Plaintiff's liabilities as "pretty significant trauma," and likely ADD or

ADHD (A.R. at 1047).   She was diagnosed with recurrent, moderate major depression disorder,

generalized anxiety disorder, social anxiety, PTSD, and rule out panic disorder (A.R. at 1047-

48).  Borderline personality traits were noted (A.R. at 1048).

The Remuda Ranch discharge summary indicates diagnoses of binge eating disorder,

major depressive disorder, social anxiety, and PTSD (A.R. at 1050).  Plaintiff's primary therapist

Anna Contour, LAC, stated that Plaintiff learned about her eating disorder, ways to manage her

depression, and how to use self-soothing skills to decrease her anxiety (A.R. at 1051).  Ms.

Contour noted that Plaintiff "struggled with symptoms of ADHD" (A.R. at 1051).  She further

indicated that Plaintiff's overall condition at discharge had mildly improved, her prognosis was

"fair," and she was "moderately committed" to recovery (A.R. at 1052).

On August 10, 2016, Plaintiff reported her stay at Remuda Ranch to Dr. Moshiri and

indicated that the treatment helped her to gain insight into her dependency and depression (A.R.

at 1216).  Her medications were Neurontin, Celexa, Klonopin, and Hydroxyzine for sleep (A.R.

at 1216).  She was tapering off Effexor (A.R. at 1216).  Plaintiff's mental status examination

mirrored Dr. Moshiri's record of January 20, 2016 except he noted that her affect was "much

brighter" (A.R. at 1216).

The record of Plaintiff's September 21, 2016 visit to Dr. Moshiri notes that she was

"doing fairly well on Celexa," was "much less depressed and more active," and was still seeing

her therapist (A.R. at 1214).  Dr. Moshiri's note of Plaintiff's mental status indicated that

Plaintiff's affect was "appropriate and varied and much brighter" (A.R. at 1214).

Plaintiff was initially assessed by Shannon Marone of Walden Behavioral Care's

outpatient intensive eating disorder program on October 17, 2016 after a referral by her dietician

(A.R. at 1119-22).  Although Plaintiff noted an increase in her depressive symptoms, she was

able to leave the house every day and completed her daily living activities (A.R. at 1119).  She

indicated that because she was unemployed, she had little or no structure to her days except to

attend her treatment appointments (A.R. at 1127).  She had signed up to volunteer at the senior

center, but had not received an assignment at the time of her initial assessment (A.R. at 1120).

Her mental status examination revealed appropriate appearance, behavior, speech, and mood,

intact thought processes and memory, linear thought content, average intelligence, "somewhat

impaired" insight, a lack of motivation, tearful affect, trouble concentrating, and poor judgment/impulse control (A.R. at 1120-21). Ms. Marone diagnosed a binge eating disorder, generalized anxiety disorder, PTSD, and ADHD, primarily ineffective type (A.R. at 1121, 1138). Plaintiff was admitted to the intensive outpatient treatment program (A.R. at 1121).

On October 26, 2016, Plaintiff told Dr. Moshiri that her depression had increased and she had "some suicidal ideations" but she contracted for safety (A.R. at 1211-12). Dr. Moshiri increased her dosage of Celexa (A.R. at 1211-12). On November 30, 2016, Plaintiff reported that her depression was "better," her anxiety had increased due to "life stressors," but she was reluctant to use Klonopin and "very rarely" used Hydroxyzine for sleep (A.R. at 1209).

Plaintiff was discharged from the Walden Center treatment program on February 9, 2017 (A.R. at 1138). She stopped binge eating during her participation in the program and was cooperative, attentive, and supportive of others (A.R. at 1138). She and her husband attended two family sessions "to discuss the role of food within their relationship, as well as roles and boundaries" (A.R. at 1138).

The record of Plaintiff's February 22, 2017 visit to Dr. Moshiri indicated that she was doing "very well," was not using Klonopin or Vistaril, and was still seeing her therapist (A.R. at 1154). On May 24, 2017, however, Plaintiff told Dr. Moshiri that she had regressed because she was not working and was not living with her husband (A.R. at 1152). Dr. Moshiri discussed "the limitations of medications given that her difficulties [were] more characterological" (A.R. at 1152). Plaintiff was using Klonopin again and remained on Celexa (A.R. at 1152). Dr. Moshiri added Latuda (A.R. at 1152).

The record of Plaintiff's July 19, 2017 visit to Dr. Moshiri indicated that Plaintiff reported that she was not doing well and that her insurance had not approved Latuda (A.R. at 1150).

14

Although Plaintiff contemplated using Zoloft again, she decided to stay with her current medication, Celexa (A.R. at 1150).  She was still attending therapy sessions and her husband had a new job as a school bus driver (A.R. at 1150).  On September 13, 2017, Plaintiff told Dr. Moshiri that she continued feeling depressed and anxious and was having difficulty being alone (A.R. at 1147).  After consulting Plaintiff's therapist, Dr. Moshiri added Zoloft and Wellbutrin to her medications and encouraged Plaintiff to reduce her use of Klonopin (A.R. at 1147).  During Plaintiff's October 11, 2017 visit to Dr. Moshiri, she indicated that she continued to feel depressed and anxious (A.R. at 1145).  They again discussed the limited benefits of medication (A.R. at 1145).

After Plaintiff exhibited depressive symptoms marked by low energy and motivation, oversleeping, isolating, and irritability, her therapist referred her to the Noble Hospital's PHP (A.R. at 1232).  Plaintiff attended the outpatient program from November 15 to 22, 2017 (A.R. at 1232).  On the date of admission, Plaintiff indicated that she drove herself to the program, did housework, and shopped (A.R. at 1236).  She enjoyed reading, singing, attending church, going out with friends, walking, and being around animals, but indicated that her lack of motivation, energy, and interest made it difficult to enjoy those activities (A.R. at 1236).  She expressed an interest in doing volunteer work (A.R. at 1236).  The mental status examination described her as being well-groomed, cooperative, depressed, and anxious (A.R. at 1238).  Her affect was appropriate, her speech was normal, her thought processes were intact, and she was not experiencing hallucinations or delusions (A.R. at 1238).  Her judgment, insight, and impulse control were good (A.R. at 1238).

Although the uncertainty of coverage under Plaintiff's husband's new insurance plan was a stressor during the PHP, Plaintiff reported "an overall improvement in depressed mood and

15

presenting symptoms, noting that the symptoms were no longer interfering with her functioning. She demonstrated [a] brighter affect and felt more capable of problem solving . . . . She identified goals for the near future which included developing daily structure and purposeful activity" (A.R. at 1232).  On the date of discharge, she was diagnosed with persistent depressive disorder (dysthymia), generalized anxiety disorder, and borderline personality disorder (A.R. at 1232).  Her assessed GAF score was 60 (A.R. at 1232).  Her depressed mood was described as "very mild," her anxiety as "mild," her emotional withdrawal as "moderate," and her "resistance, guardedness, [and] rejection of authority" was assessed as being "moderately severe" (A.R. at 1239).  After discharge, she planned to perform volunteer work, follow up with her therapist, and engage a medication provider who was covered by her new health insurance plan (A.R. at 1252).

On March 21, 2018, after the change in her health insurance, Plaintiff visited psychiatrist Morris Pardo, M.D., who replaced Dr. Moshiri for medication management (A.R. at 1279).  Dr. Pardo noted that Plaintiff was attentive, cooperative, and tense (A.R. at 1278).  Her speech was normal, spontaneous, coherent, clear, overtalkative, and pressured (A.R. at 1278).  Her thought processes were normal, logical, and goal-directed, and her thought content was normal and relevant (A.R. at 1278).  Her judgement and insight were fair, her memory was intact, her ability to attend and concentrate were normal, her fund of knowledge was intact, her mood was anxious and despairing, and her affect was appropriate (A.R. at 1278).  Plaintiff's psychiatric specialty examination was essentially unchanged when she visited Dr. Pardo on April 19, 2018 (A.R. at 1275-76).

  C. <u>Opinions</u>

    1. Dr. Moshiri

Dr. Moshiri completed a Mental Impairment Questionnaire on April 13, 2016 (A.R. at 1019-22).  The details of his opinion are discussed in the analysis.

        2.      Bertine C. Galipeau, Licensed Educational Psychologist

On September 5, 2014, Plaintiff's therapist at Koinonia Services Trust, Licensed Educational Psychologist Bertine C. Galipeau, indicated that, at that time, Plaintiff suffered from "significant depression" due to the loss of two pregnancies and would "not be able to consider employment due [to] anxiety and physical limitations that affect her need to continue further adjustments for further coping and emotional management strategies" (A.R. at 893).  Therapy addressed her avoidance of "life skills" such as seeking employment (A.R. at 894).

On April 9, 2018 Ms. Galipeau submitted a letter in support of Plaintiffs application for DIB (A.R. at 1224-25).  Ms. Galipeau indicated that Plaintiff had been diagnosed with a generalized anxiety disorder, depression, an eating disorder, ADD, and character traits of borderline personality disorder (A.R. at 1224).  According to Ms. Galipeau, Plaintiff's mental impairments prevented her from carrying out activities of daily living (A.R. at 1224).  "Most of her days are those of exaggerated worry, typically, which are of realistic concerns, but taken to extremes," making her unable to cope and to function (A.R. at 1224-25).  Ms. Galipeau stated that Plaintiff's "constant worry [was] so intent [sic] that it . . . robbed her ability from [sic] holding onto employment" (A.R. at 1225).[4]

        3.      State Agency Nonexamining Consultants

On September 10, 2014, Jon Perlman, Ed.D., assessed Plaintiff's mental RFC after reviewing Plaintiff's records (A.R. at 413-16, 423-24).  Dr. Perlman noted Plaintiff's affective

---

[4] In 2016, Ms. Galipeau also submitted a letter in support of Plaintiff's DIB application (A.R. at 1226-28).  Because it essentially mirrors her other opinions, it is not discussed separately.

disorders, anxiety disorders, and ADD/ADHD and opined that Plaintiff had no limitations on understanding and memory or adaptation (A.R. at 418, 423-24).  As to limitations on Plaintiff's ability to sustain concentration and persist, Dr. Perlman deemed Plaintiff to be "capable of completing simple, routine tasks [and] can sustain concentration for at least two hours in simple 1 and 2 step tasks" (A.R. at 424).  Dr. Perlman found that Plaintiff had a moderate limitation in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes but could "relate in a socially appropriate manner" (A.R. at 424).  In December 2014, on reconsideration, Michael Maliszewski, Ph.D., agreed with Dr. Perlman's opinions (A.R. at 438-39).

      D.    <u>Hearing Testimony</u>

          1.    Plaintiff's Testimony

Plaintiff testified that she had attempted seasonal work twice after leaving her full-time job at WalMart (A.R. at 358).  She tried working as a cashier at Kohl's in 2013, but her "anxiety went through the roof" when she began training to use the cash register and considered how busy the store would be during the holiday season (A.R. at 358-60).  Two years later, Plaintiff applied for a seasonal job as a salesperson and cashier at the Yankee Candle store in the Holyoke Mall (A.R. at 358).  She left the job because she "couldn't deal with the pressure and . . . all the people" (A.R. at 359).  Plaintiff testified that being around "a lot of people" caused her to sweat, experience a rapid heartrate, and feel claustrophobic (A.R. at 360).  She avoided crowds (A.R. at 368-69).

Plaintiff lived alone at the time of the hearing (A.R. at 360).  She cooked, washed dishes, did laundry, watched TV, and spent time on social networking sites on her phone (A.R. at 362-63).  During the week before the hearing, she drove to her parents' home, to the grocery store,

and to a medical appointment (A.R. at 360, 361).  She had performed volunteer work ("simple

tasks") twice a week in the children's section of a library (A.R. at 361-62).

She also testified that she sometimes stayed in bed most of the day due to depression

(A.R. at 363, 364, 368).  According to Plaintiff, she attended the PHPs at Noble Hospital to get a

"kick start" to get out of the house (A.R. at 367).  The PHPs provided a daily schedule, a reason

to get out of bed in the morning, and social interaction (A.R. at 367).

Plaintiff indicated that her anxiety was triggered by the lack of control, fear of the future,

and contemplating returning to work (A.R. at 369, 375).  Taking a walk would relieve her mild

anxiety, but she needed medication to treat her intense anxiety (A.R. at 369-70).  She described

difficulty concentrating on difficult or boring tasks and needing reminders of medical

appointments (A.R. at 370, 371).

        2.       The Vocational Expert's Testimony

The ALJ asked vocational expert Zachary Foster ("VE") to assume a person with

Plaintiff's age, education, and work experience who could:  lift and carry twenty pounds

occasionally and ten pounds frequently and push and pull up to those exertional levels;

occasionally reach overhead using her bilateral upper extremities; stand and walk for six hours

during an eight hour day; sit for eight hours during an eight hour day; occasionally crouch, crawl,

kneel, climb ramps and stairs, but never climb ladders, ropes, and scaffolds; tolerate occasional

exposure to extreme cold, but needed to avoid hazards; understand, remember, and carry out

simple instructions throughout an ordinary work day and normal work week with normal breaks

on a sustained basis; occasionally interact with the general public; have occasional and

superficial contact with co-workers without teamwork or collaboration; respond appropriately to

supervisory directions and feedback for simple work-related matters; adapt to simple and

occasional change in the routine work setting; and make simple work-related decisions (A.R. at 378-79). The VE opined that the hypothetical person could not perform Plaintiff's past work, but could perform the unskilled jobs of a sorter, an inspector, and an assembler (A.R. at 379-80). Those jobs could also be performed by a person who could have superficial and occasional interaction with the general public or could have no interaction with the general public (A.R. at 380-81). However, there were no jobs in the national economy for an individual who was regularly absent twice a month or who was off task for two hours per day (A.R. at 381-82).

III.     THE COMMISSIONER'S DECISION

A.     <u>The Legal Standard for Entitlement to DIB</u>

In order to qualify for DIB, a claimant must demonstrate that she is disabled within the meaning of the Act. A claimant is disabled for purposes of DIB if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe

impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's Residual Functional Capacity ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate his or her RFC.  *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *See Goodermote*, 690 F.2d at 7.

B.      The ALJ's Decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote,* 690 F.2d at 6-7.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of May 18, 2012 through December 31, 2017, the date on which she was last insured (A.R. at 21).  *See* 20 C.F.R. § 404.1571 *et seq.*  At step two, the ALJ found that Plaintiff had the following severe impairments:  cervical degenerative changes (C6-7), left ankle osteoarthritis and tenosynovitis, obesity, major depressive disorder, dependent personality disorder, ADHD, and an eating disorder (A.R. at 22).  *See* 20 C.F.R. § 404.1520(c).  For purposes of step three, the ALJ reviewed Plaintiff's impairments and determined that her impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 32-34).  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  In assessing the so-called "paragraph B" criteria, the ALJ determined that Plaintiff had moderate limitations in understanding, remembering, or applying information, interacting with others, and adapting or managing herself and had a mild limitation in her ability to concentrate, persist, or maintain pace (A.R. at 32-33).[5]

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether she could perform past relevant work, and, if the analysis continued to step five, to determine if she could do other work.  *See* 20 C.F.R. § 404.1520(e).  The ALJ determined that Plaintiff had the RFC to perform light work with the following exceptions:

---

[5] To satisfy the "paragraph B" criteria, a mental impairment must result in at least one extreme or two marked limitations in the following broad areas of mental functioning:  understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  20 C.F.R. § 404.1520a(c)(3).  "[T]he limitations identified in the 'paragraph B' criteria and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

> [She] can lift, carry, push, and pull up to 20 pounds occasionally and up to 10 pounds
> frequently.  She can stand and walk 4 hours in an[] 8-hour workday and . . . sit up to 8
> hours in an 8-hour workday.  She can perform occasional overhead reaching with the
> bilateral upper extremities [and] can occasionally crouch, crawl, kneel, balance, and
> climb ramps and stairs.  She cannot climb ladders, ropes, or scaffolds.  She cannot
> tolerate exposure to hazards, such as dangerous moving machinery and unprotected
> heights.  She can understand, remember, and carry out simple instructions throughout an
> ordinary workday and workweek with normal breaks on a sustained basis.  She cannot
> interact with the general public.  She can respond appropriately to occasional and
> superficial contact w[ith] coworkers without teamwork or collaboration.  She can respond
> appropriately to supervisory directions and supervisory feedback for simple work-related
> matters.  She can make simple work-related decisions.  She can adapt to simple and
> occasional change in the routine work setting.

(A.R. at 34).  At step four, the ALJ found that Plaintiff would not have been able to perform her

past relevant work through the date last insured (A.R. at 41).  *See* 20 C.F.R. § 404.1565.

However, considering Plaintiff's age, education, work experience, and RFC, based on the VE's

testimony, the ALJ found that Plaintiff could perform the unskilled jobs of a sorter, an inspector,

and an assembler (A.R. at 42).  *See* 20 C.F.R. §§ 404.1569, 404.1569(a).  Consequently, on

September 5, 2018, the ALJ concluded that Plaintiff was not under a disability, as defined by the

Act, at any time from June 12, 2014, the alleged onset date, through December 31, 2017, the date

last insured (A.R. at 43).  *See* 20 C.F.R. § 404.1520(g).

IV.  STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).

Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by

substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,* 892

F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court

reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are

supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

V.   ANALYSIS

The single issue that Plaintiff raises in her memorandum in support of her motion for judgment on the pleadings is the ALJ's assignment of "little weight" to the April 13, 2016 opinion of her treating psychiatrist, Dr. Moshiri, concerning the nature and severity of Plaintiff's mental impairments (A.R. at 1021-22; Dkt. No. 15 at 10-18).  Plaintiff contends that the ALJ failed to comply with the requirement that she give "good reason" for not affording controlling weight to Dr. Moshiri's opinion.  The Commissioner argues that the ALJ complied with her obligation to explain the weight she assigned to Dr. Moshiri's opinions and her decision not to

give those opinions controlling weight (Dkt. No. 23 at 10-13).  The Commissioner has the better argument.[6]

"An ALJ must 'always consider the medical opinions in [the] case record,' 20 C.F.R. §§ 404.1527(b); 416.927(b), and SSA regulations prioritize the opinions of a claimant's treating sources."  *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (alteration in original) (citing 20 C.F.R. §[] 404.1527(c)(1) ("[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you").

> The treating source rule provides that the ALJ should give "more weight" to the opinions of treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."

*Id.* (alteration in original) (citing 20 C.F.R. § 404.1527(c)(2)).  "The relevant legal standard for a claim filed before March 27, 2017 (as [Plaintiff's] was) is the rule that a treating physician's opinion is controlling if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Purdy,* 887 F.3d at 13 (quoting 20 C.F.R. § 416.927(c)(2)) (second alteration in original)).  "And even if not deemed controlling, a treating physician's opinion is entitled to weight that reflects the physician's opportunity for direct and continual observation."  *Id.* Nonetheless, an ALJ may discount a treating physician's opinion if it is unsupported by objective medical evidence or is contradicted by other treatment records or medical opinions.  *See Arroyo v. Sec'y of Health & Human Servs.,* 932 F.2d 82, 89 (1st Cir. 1991) ("The law in this circuit does

---

[6] Plaintiff does not challenge the ALJ's assignment of "[l]ittle to no weight" to Dr. Galipeau's opinion and "[s]ome, but limited weight" to the state agency consultants' opinions (A.R. at 39, 40).

not require ALJs to give greater weight to the opinions of treating physicians."); *Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 276 (1st Cir. 1988) ("A treating physician's conclusions regarding total disability may be rejected by the Secretary especially when, as here, contradictory medical advisor evidence appears in the record.").

> When an administrative law judge does not accord a treating source's opinion controlling weight, he or she must consider the length, nature, and extent of the treatment relationship, the opinion's supportability and consistency with the record as a whole, the treating source's area of specialization, and any other relevant factors to determine the weight the opinion deserves.

*Taylor v. Astrue*, 899 F. Supp. 2d 83, 87 (D. Mass. 2012).  *See* 20 C.F.R. § 404.1527(c)(2)-(6).

"The administrative law judge also must provide 'good reasons' for the weight ultimately assigned to the treating source opinion."  *Taylor*, 899 F. Supp. 2d at 87–88 (citing 20 C.F.R. § 404.1527(c)(2)); *see also Bourinot,* 95 F. Supp. 3d at 176.

> [T]he . . . decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). !!

Dr. Moshiri was Plaintiff's treating psychiatrist from 2013 to 2017.  In an April 13, 2016 mental health questionnaire, Dr. Moshiri diagnosed Plaintiff with major depression, anxiety, and a personality disorder NOS and assigned her a GAF score of 40 (A.R. at 1019).  He indicated that Plaintiff's activities of daily living were markedly restricted, that she suffered from extreme difficulties in maintaining social functioning and concentration, persistence, or pace, and that she had experienced four or more episodes of decompensation within a twelve month period, each of

at least two weeks duration (A.R. at 1021-22).[7]  Dr. Moshiri opined that Plaintiff's disorders

responded poorly to medication and therapy, her anxiety-related disorder would render her

completely unable to function independently outside her home, and her mental impairments

would cause her to be absent from work more than four days per month (A.R. at 1022).  He cited

Plaintiff's depression, tearfulness, difficulty being alone, poor concentration, and past suicidal

ideation as support for his assessment of the severity of her mental impairments and symptoms

and described Plaintiff's prognosis as "guarded" (A.R. at 1019).

      The ALJ considered the length and nature of Dr. Moshiri's treating relationship with

Plaintiff, acknowledging that the records of Dr. Moshiri's psychiatric treatment relationship with

Plaintiff were extensive (A.R. at 40).  *See Taylor*, 899 F. Supp. 2d at 87.  She accurately

summarized the contents of those records, taking note of Plaintiff's accounts of her symptoms

and states of mind, activities, and reactions to medication, and Dr. Moshiri's observations about

Plaintiff's appearance, speech, and affect (A.R. at 23-31).  The ALJ relied principally on the

contents of Dr. Moshiri's treatment records as providing the reason she afforded "little weight"

to his opinions in the mental health questionnaire concerning the severity of Plaintiff's mental

impairments (A.R. at 40).  *See id.* at 87-88.  The ALJ noted that Dr. Moshiri's treatment notes

demonstrated Plaintiff's active engagement in her treatment and were inconsistent with his

opinion that Plaintiff's "consistent severe limitations" rendered her unable to function

independently outside her home (A.R. at 40).  Plaintiff regularly identified which prescribed

---

[7] "Episodes of decompensation" were defined in the questionnaire as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace.  Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)" (A.R. at 1021).

medications relieved her symptoms, which were ineffective, and which exacerbated her symptoms (A.R. at 921, 924, 926, 927-28, 935, 936, 1214).  She told Dr. Moshiri when she needed a medication change and when she wanted to discontinue medication because she was doing well (A.R. at 923, 929, 931-32, 934, 1030, 1154).  *See Gates v. Colvin,* No. 3:12cv00220, 2013 WL 3087268, at *12 (S.D. Ohio June 18, 2013), *rec. dec. adopted sub nom. Gates v. Comm'r of Soc. Sec.,* No. 3:12cv220, 2013 WL 5441762 (S.D. Ohio Sept. 27, 2013) (plaintiff's ability to provide feedback in group therapy sessions was a factor that was considered in finding her not disabled due to mental impairments); *Johnson v. Astrue,* No. CV 08-03878-CT, 2009 WL 82692, at *9 (C.D. Cal. Jan. 12, 2009) (same).

Dr. Moshiri's treatment records also support the ALJ's finding that, in contrast to his opinions in the mental health questionnaire, he generally – with some exceptions – found Plaintiff's anxiety and depression symptoms to be "moderate" and responsive to medication (*see, e.g.,* A.R. at 40, 918, 924, 928, 930, 932, 933, 934, 935, 936, 937, 938, 1024, 1028).  At times, Dr. Moshiri described Plaintiff's mood and affect as being unremarkable (A.R. at 925 ["marked decrease" in anxiety], 926 ["no overt anxiety"], 917, 922, 923, 929, 1026, 1030 ["appropriate" affect], 939 ["stable and in good spirits"], 1214, 1216 ["much brighter" affect].  He noted that she functioned well without medication for four months in 2015 (A.R. at 1028) and characterized her anxiety and depression as "situational" (A.R. at 1026, 1145, 1152) in that her symptoms were triggered by specific events such as the anniversaries of her baby's death and due date, financial difficulties, separation from her husband, and work in a retail store during a busy holiday season. *See Bourinot*, 95 F. Supp. 3d at 178 (the ALJ's assignment of "'limited weight'" to the plaintiff's treating psychiatrist's opinion was supported by the inconsistency between the opinion and the psychiatrist's treatment notes, which noted that the plaintiff "consistently appeared well at her

28

appointments, her depression and anxiety symptoms appeared to be situational, and she exhibited an ability to participate in activities when she wanted to.").

While the ALJ did not explicitly link her review of the records of other treatment providers to her assessment of Dr. Moshiri's opinion, she summarized the contents of those records, affording considerable weight to the records from Plaintiff's partial hospitalizations at the Noble Hospital in May 2013, September 2014, and November 2017, which showed that Plaintiff benefited from setting goals, developing a daily structure, and interacting with others (A.R. at 38). "If a treating physician's opinion is inconsistent with other authoritative evidence in the record, the conflict is for the Commissioner—and not the court—to resolve." *August v. Astrue,* Civil Action No. 06-10332-RGS, 2007 WL 737766 at \*6 (D. Mass. Mar. 8, 2007) (citing *Rodríguez,* 647 F.2d at 222). Plaintiff actively participated in the outpatient treatment programs at the Noble Hospital and the Walden Center and an inpatient program at the Remuda Ranch (A.R. at 38, 39, 900, 903, 905, 1051, 1138, 1232). At the conclusion of the Noble Hospital's PHP in 2017, Plaintiff's anxiety was described as "mild," her depression was described as "very mild," and her emotional withdrawal was described as "moderate" (A.R. at 1239). She "demonstrated a brighter affect" (A.R. at 1232). The discharge summary from the Remuda Ranch, where Plaintiff spent almost two months, indicated improvement and a "fair" prognosis (A.R. at 39, 1052). Plaintiff stopped binge eating while participating at the Walden Center's program for about six months (A.R. at 30, 39, 1119, 1138).

In summary, the ALJ adequately explained her reasons for discounting Dr. Moshiri's opinion concerning Plaintiff's functional limitations. *See* SSR 96-2p, 1996 WL 374188, at \*5. Dr. Moshiri's view that Plaintiff's ability to engage in activities of daily living was markedly limited was inconsistent with Plaintiff's description of her ability to drive, shop, do housework,

visit her family, engage with friends through social networking, and volunteer at a library (A.R. at 38, 361-63, 655, 658, 1236). Plaintiff's support of other program participants, attendance at a Red Sox game, and meeting friends for coffee contradicted Dr. Moshiri's judgment that her social functioning abilities were extremely limited (A.R. at 25, 655, 900, 905, 1138).  Finally, as to Plaintiff's ability to maintain concentration, persistence, or pace, although she was diagnosed with ADD or ADHD, nothing in the record supported Dr. Moshiri's assessment of an extreme limitation (A.R. at 1021).  Plaintiff's completion of program assignments and appropriate interactions with her treatment providers indicated her ability to focus (A.R. at 25, 33, 1051).  In addition, Plaintiff's mother stated that Plaintiff was able to finish reading books that she found interesting (A.R. at 39, 655, 660).

"Plaintiff must show not only the existence of evidence in the record *supporting* her position but must also demonstrate that the evidence relied on by the ALJ is either insufficient, incorrect, or both." *Green v. Astrue,* Civil Action No. 11–30084-KPN, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012).  Plaintiff's recitation of Dr. Moshiri's treatment records and descriptions of her presenting symptoms at the Noble Hospital's PHPs fail to make that required showing (Dkt. No. 15 at 12-18).  Accordingly, the ALJ's assignment of "little weight" to Dr. Moshiri's opinion is adequately explained and is supported by substantial evidence.

VI.    CONCLUSION

For the above-stated reasons, Plaintiff's motion for judgment on the pleadings (Dkt. No. 14) is DENIED and the Commissioner's motion to affirm his decision (Dkt. No. 22) is GRANTED.  The case will be closed.

It is so ordered.

Dated:  November 19, 2020                           /s/ Katherine A. Robertson
                                                    KATHERINE A. ROBERTSON

U.S. MAGISTRATE JUDGE